WALTON, BARROWS, DANFORTH, PETERS, LIBBEY and SYMONDS, JJ., concurred.

---

WILLIAM E. BARROWS *vs.* JOHN M. MCDERMOTT.

Piscataquis.    Opinion May 27, 1882.

*Fishing.    Great ponds.    Trespass.*

The colonial ordinance of 1641 more particularly defined in 1647, and declaring among other things a common right of free fishing and fowling on great ponds of more than ten acres in extent, lying in common, has been so long and so uniformly accepted and acted upon in this State that it constitutes in all its parts a portion of the common law of the whole State without regard to the question whether it was ever extended by legislative authority to localities not embraced within the precincts of the colony of Massachusetts Bay.

Any person has the right to go to such a pond on foot, through uninclosed wood-lands belonging to another, and to take fish there; but the privilege must be exercised as it is conferred by the ordinance, and he must see to it that he trespasses on no man's corn or meadow, tillage or grass land.

ON REPORT.

Trespass *qu. cl.* submitted to the court upon agreed statement of facts which are substantially stated in the opinion.

*A. G. Lebroke and W. E. Parsons,* for the plaintiff.

The fact that the public had, for many years, to wit, thirty-five years, had access to the pond on said close, for the purpose of

fishing, conferred no right upon defendant to enter plaintiff's close for any purpose. The public cannot acquire an easement by prescription in land for the purpose of taking fish. A custom by the public, to take a profit from the land of another, is bad. *Waters* v. *Lilley*, 4 Pick. 145; *Littlefield* v. *Maxwell*, 31 Maine, 134.

The defendant would invoke the colonial ordinance of 1647. The *locus in quo* was in 1641 and 1647, if subject to any European power, subject to the grants and control of the French government, and not of the English. The territory of the town or township of Howard as will be seen by inspection of any and all maps, is situated north of the parallel of the forty-fifth degree north latitude. Abbott's History of Maine, 31, 106, 100, 101, 208; British Dominion in America, book 3d, part 2d, page 246; Address of Ex-Governor J. L. Chamberlain, at the Centennial Exposition, at Philadelphia, November 4, 1876, and in Convention of the Legislature of Maine, February 6, 1877, found in the published volume of the acts and resolves of the legislature of Maine, A. D. 1877, 269, 288; Hazard's Collection, vol. 1, 442; Goodrich's History of the United States, edition of 1849, page 47; Holmes' American Annals, vol. 1, p. 301; Hubbard's History of New England, p. 133; Summary of British Settlements in North America by William Douglass, vol. 1, 332, 389; Willis' History of Portland, 222; Williamson's History, vol. II, 10; 1 Hazard's Historical Collections, 105, 111; Plymouth Colonial Laws, (ed. 1836,) 3-10, cited in note appended to *Commonwealth* v. *Roxbury*, 9 Gray, 503; Laws of Massachusetts, published 1807, vol. 2, page 969.

The above references and books of history are proper to be considered by the court. 1 Green. Ev. § § 4, 5, 6, 497; *West Roxbury* v. *Stoddard*, 7 Allen, 158; *Commonwealth* v. *Roxbury*, 9 Gray, 451; *Storer* v. *Freeman*, 6 Mass. 438; *Winthrop* v. *Curtis*, 3 Maine, 115; *United States* v. *Teschmaker*, 22 Howard's U. S. Rep. 392.

But suppose the *locus in quo* had been embraced in territory belonging to Massachusetts, at the time of the adoption of the

ordinance of 1647, the result would not be different. First, because the better opinion is that the revocation and annulling of the charter of the colony of Massachusetts Bay by the decree in chancery in 1684 or 1685 swept away every vestige of the ordinances of 1641 and 1647, so that neither afterwards had any effect *ex proprio vigore*, even in Massachusetts. *Storer* v. *Freeman*, 6 Mass. 438; *Winslow* v. *Patten*, 34 M. 25; see Governor Chamberlain's address, *supra*; Goodrich's School History, edition of 1849, page 77, *et seq.*; *Storer* v. *Freeman*, 6 Mass. 438; *Mayhew* v. *Norton*, 17 Pick. 360; *Barker* v. *Bates*, 13 Pick. 258; *Commonwealth* v. *City of Roxbury*, 9 Gray, 465, note; Laws of Massachusetts, vol. 2, (1807) page 966.

Secondly, it makes no matter of difference who owned the soil because the ordinance of 1647 applied only to the Massachusetts Bay colony. A learned note appended to *Commonwealth* v. *Roxbury*, 9 Gray, 523, citing the following authorities, reads thus: "The ordinance of 1647 (in relation to flats,) has been extended by usage to Plymouth, to Nantucket, and Dukes county and to Maine, although none of them were under the jurisdiction of Massachusetts when it was made. Sulivan on Land Titles, 285; *Barker* v. *Bates*, 13 Pick. 258, 260; *Mayhew* v. *Norton*, 17 Pick. 357; *Storer* v. *Freeman*, 6 Mass. 435; 2 Dane's Ab. 701; *Codman* v. *Winslow*, 10 Mass. 146; *Lapish* v. *Bangor Bank*, 8 Greenl. 89; *Weston* v. *Sampson*, 8 Cush. 354; *Commonwealth* v. *Alger*, 7 Cush. 76; *Moulton* v. *Libbey*, 37 Maine, 485."

It is not admitted in the case that the ordinance of 1647 applied to, or in any way affected the territory of which the *locus in quo* was a part. By the above authorities cited in *Commonwealth* v. *Roxbury*, 9 Gray, 523, it is conclusively settled that neither the ordinance of 1641 nor 1647 applied to the State of Maine. *Barker* v. *Bates*, 13 Pick. 258.

A common law rule has grown up in this State, in relation to the flats between high and low water mark, where the tide ebbs and flows, which is a modification of the principle thereon declared in the ordinance of 1641-7. This even, came only by judicial adoption. *Lapish* v. *Bangor Bank*, 8 Maine, 85; *Winslow* v.

*Patten*, 34 Maine, 25 ; *Storer* v. *Freeman*, 6 Mass. 438 ; *Emerson* v. *Taylor*, 9 Maine, 43 ; *Moulton* v. *Libbey*, 37 Maine, 499. It is clear that the court in Maine have adopted a rule in relation to flats which is peculiar to our jurisdiction, showing that we are not bound by the literal expression of the ordinance, even as a common law rule.

The fact that our courts have adopted the ordinance, or any principle of it in relation to flats is no evidence that they have adopted, or will adopt the same in relation to fishing in ponds.

When a principle of common law, or body of common law, is adopted by one state or country from another state or country, it is always at the option of the former to adopt the same with such modifications as are deemed proper, under the circumstances of the country. Joel Prentiss Bishop, says in his first book of the law, § 51, (edition of 1868,) : "The established doctrine of our courts is, that our ancestors conveyed hither the entire body of the English law as it was when they emigrated, only they did not need and so did not bring any laws which were inapplicable to their altered situation and circumstances." Of course they were the sole judges of what they should adopt or reject.

Among a multitude of authorities he cites : *Commonwealth* v. *Hunt*, 4 Met. 111, 122 ; *Pawlet* v. *Clark*, 9 Cranch, 292, 333 ; *Wheaton* v. *Peters*, 8 Peters, 591, 659 ; *Piatt* v. *Eads*, 1 Blackford, 81 ; *Lindsley* v. *Coats*, 1 Ohio, 243 ; *Lyle* v. *Richards*, 8 Sergeant and Rawle, 322 ; *Piersons* v. *The State*, 12 Ala. 149 ; *Stout* v. *Keyes*, 2 Douglass, Mich. 184 ; *Abell* v. *Douglass*, 4 Denio, 305 ; *Commonwealth* v. *Holmes*, 17 Mass. 336 ; *Commonwealth* v. *Churchill*, 2 Met. 118 ; *Simpson* v. *The State*, 5 Yerger, 356 ; *The State* v. *Rollins*, 8 N. H. 550 ; *The State* v. *Moore*, 6 Foster, N. H. 448, 455 ; *Norris* v. *Harris*, 15 Cal. 226.

Grindstone Pond does not lie in common, in the sense of the ordinance of 1647 ; but is wholly within plaintiff's close, which is in his actual possession, both by cultivation of the soil, and occupancy for maintaining fish. The seizin of the entire estate was, and is, in the plaintiff. *Waters* v. *Lilley*, 4 Pick. 145 ; *Commonwealth* v. *Tiffany*, 119 Mass. 303 ; *Commonwealth* v.

*Weatherhead*, 110 Mass. 175; *Cummings* v. *Barrett*, 10 Cush. 188; *West Roxbury* v. *Stoddard*, 7 Allén, 167; *Canal Commissioners* v. *The People*, 5 Wend. 423; *Ledyard* v. *Ten Eyck*, 36 Barb. 102; R. S., c. 40, §§ 51, 52, 53, amended by c. 170 of pub. laws of 1874; the plaintiff, in this case had the exclusive right to protect the fish in Grindstone Pond, against all parties.

The word "pond" in § 53, c. 40, R. S., is general, without regard to size. "To take fish no one can, lawfully, go on another's land without his leave." Dane's Abridgement, ed. of 1823, vol. 2, c. 68, art. 7, § 4, item 3, page 706.

"But for taking fish, no man could lawfully go on the soil of another without his leave." *Peables* v. *Hannaford*, 18 Maine, 106; *Boatwright* v. *Bookman*, 1 Rice, (South Carolina) 447; *Stephenson* v. *Gooch*, 7 Greenl. 152; Cooley on Torts, 329, *et seq.*; *Cottrill* v. *Myrick*, 12 Maine, 222. A right to fish in any waters gives no power over the land. *Cortelyou* v. *Van Brundt*, 2 Johns. 274; Cooley on Torts, 329, 330, 331; *Bickel* v. *Polk*, 5 Harrington, (Del.) 325; *Cobb* v. *Davenport*, 32 N. J. 369; Sup. C. 33 N. J. 223.

By the common law the rule regarding fresh water streams in the matter of taking fish, applies to the small lakes or ponds of the country. Cooley on Torts. 330, and authorities cited. Now then, by the common law, the right to take fish in the fresh water streams of the country, belongs to the owners of the soil under them, extending to the middle of the stream, if the riparian proprietor owns only on one side of the stream, but extending the whole width of the stream, if such riparian proprietor owns on both sides. This right excludes the public from fishing on the proprietor's estate, though the legislature may regulate the passage of fish on such streams. *McFarlin* v. *Essex Company*, 10 Cush. 309; Cooley on Torts, 329, and note 2; *Waters* v. *Lilley*, 4 Pick. 145; *Commonwealth* v. *Chapin*, 5 Pick. 199; *Adams* v. *Pease*, 2 Conn. 481; *Yard* v. *Carman*, 2 Penn. 936; *Ingram* v. *Thready*, 3 Devereux, (North Carolina) 59; *Randolph* v *Braintree*, 4 Mass. 317; *Lunt* v *Holland*, 14 Mass.

149 ; *Cottrill* v. *Myrick*, 12 Maine, 222 ; *Hooker* v *Cummings*, 20 Johns. 90 ; *Trustees, &c.* v. *Strong*, 60 N. Y. 56 ; *Williams* v. *Buchanan*, 1 Iredell, 535 ; *Beckman* v *Kreamer*, 43 Ill. 447 ; *Cobb* v *Davenport*, 32 N. J. 369 ; and *Same* v. *Same*, 33 N. J. 223 ; *Browne* v. *Kennedy*, 5 H. & J. (Md.) 195.

*J. F. Sprague and Henry Hudson*, for the defendant, cited : *Moore* v. *Veazie*, 32 Maine, 356 ; *Brown* v. *Chadbourne*, 31 Maine, 22 ; *Attorney General* v. *Woods*, 108 Mass. 439 ; *West Roxbury* v. *Stoddard*, 7 Allen, 171 ; *Lapish* v. *Bangor Bank*, 8 Maine, 85 ; *Winslow* v. *Patten*, 34 Maine, 25 ; *Partridge* v. *Luce*, 36 Maine, 16 ; *Clancey* v. *Houdlette*, 39 Maine, 451 ; *Cummings* v. *Barrett*, 10 Cush. 188 ; *Fay* v. *Danvers A. Co.* 111 Mass. 27 ; *Paine* v. *Woods*, 108 Mass. 169 ; *Commonwealth* v. *Alger*, 7 Cush. 67 ; *Storer* v. *Freeman*, 6 Mass. 439 ; *Barker* v. *Bates*, 13 Pick. 258 ; *Weston* v. *Sampson*, 8 Cush. 353 ; *Com.* v. *Roxbury*, 9 Gray, 503 ; *Com.* v. *Vincent*, 108 Mass. 446 ; *Codman* v. *Winslow*, 10 Mass. 146 ; *Deering* v. *Long Wharf*, 25 Maine, 64 ; *Low* v. *Knowlton*, 26 Maine, 132 ; *Moulton* v. *Libbey*, 37 Maine, 485 ; *Preble* v. *Brown*, 47 Maine, 284.

BARROWS, J. The substance of the admitted facts upon which this case is presented for decision is as follows : In the summer of 1880, the plaintiff held as proprietor a tract of land in the township of Howard, containing a natural pond covering about twenty acres called Grindstone Pond, surrounded by wild and uncultivated land with the exception of a single piece of about two acres which had been cleared and cultivated, adjacent to the pond, but upon which no crops were raised or grass cut in 1880. To protect and increase the propagation of fish in this pond the plaintiff had forbidden all persons from entering on his land surrounding the pond or fishing in its waters, by posting on the cleared piece above mentioned and elsewhere around and on the shore of the pond conspicuous notices to that effect painted upon boards in legible letters.

But the defendant in defiance of the prohibition on divers days in the summer of 1880, went there, as all who wished had been

accustomed to do for thirty-five years before the notices were posted, and caught and carried away fish from the pond without permission from the plaintiff, passing for that purpose over and through the cleared piece of land adjoining the pond, no part of which was enclosed by a fence of any kind. Hence this action of trespass *quare clausum*, alleging in proper form the above facts with the exception of the posting of the plaintiff's prohibitory notices. The case is hereupon submitted to the court for judgment according to the legal rights of the parties, the damages, if the plaintiff is found entitled to prevail, being agreed to be one dollar.

The defendant bases his justification of the acts here complained of as trespasses, upon the Massachusetts Bay Colonial Ordinance of 1641 as amended in 1647, which is an early declaration of common rights and liberties, and some rules and principles respecting the tenure and proprietorship of certain kinds of real estate, adopted by the Massachusetts Bay colonists soon after the settlement there was effected. It declares among other things the right of free speech within due and orderly limits at public assemblies, the right of free fishing and fowling for all in and upon any great pond lying in common and containing more than ten acres in extent with the incidental right to "pass and re-pass on foot through any man's property for that end so they trespass not upon any man's corn or meadow" — the right of property to low water mark in the owner of lands adjoining the salt water where the sea doth not ebb above a hundred rods, and no more where it ebbs further, subject to the right of passage of boats or vessels — and the free right of removal from the colony " provided there be no legal impediment to the contrary." Anc. Chart. and Laws of Mass. Bay, chap. LVIII, p. 148.

The plaintiff's counsel strikes at the root of this defence in an elaborate effort, exhibiting not a little historical research, to show that those who framed this ordinance had no jurisdiction over the *locus*, and that it never was law for such portion of this State as falls within the limits of the ancient Acadia.

It may well be that the ordinance has no force by virtue of positive enactment by any legislative body having jurisdiction at

the time of such enactment over what is now the county of Piscataquis, and that its operation has never been extended there by any specific act of legislation since; and it is quite true that when under the charter of William and Mary, the great and general court of Assembly of the Province, in 1692, acting for the three united colonies of Massachusetts Bay, Plymouth, and Maine, re-enacted " all the local laws respectively ordered and made by the late governor and company of the Massachusetts Bay and the late government of New Plymouth" it was done on such terms that they continued in force only " in the respective places for which they were made and used" so that the ordinance under consideration was never in terms extended to the Plymouth colony or to Maine under any legislative sanction.    See Anc. Charters, &c. pp. 213, 229.

But it has been so often and so fully recognized by the courts both in this State and in Massachusetts as a familiar part of the common law of both, throughout their entire extent, without regard to its source or its limited original force as a piece of legislation for the colony of Massachusetts Bay, that we could not but regard it as a piece of judicial legislation to do away with any part of it or to fail to give it its due force throughout the State until it shall have been changed by the proper law making power.    When a statute or ordinance has thus become part of the common law of a State it must be regarded as adopted in its entirety and throughout the entire jurisdiction of the court declaring its adoption.    *Barker* v. *Bates*, 13 Pick. 255 ; *Commonwealth* v. *Alger*, 7 Cush. 53, 76, 79.

It is not adopted solely at the discretion of the court declaring its adoption, but because the court find that it has been so largely accepted and acted on by the community as law that it would be fraught with mischief to set it aside.

It is not here and now a question whether this ordinance shall be adopted with such modifications as might be deemed proper under the circumstances of the country.    It has been long since adopted in all its parts, acted upon by the whole community and its adoption declared by the courts ; and now the argument of the plaintiff's counsel aims to have us declare either that it has not

the force of law in certain parts of the State, or that the court may change it if satisfied that it does not operate beneficially under present circumstances. We cannot so view it. That which has the force of common law in one county in this State has the same force in all.

To show that this ordinance has been long and constantly regarded as law in this State reference may be had to the following decisions: *Storer* v. *Freeman*, (Cumberland county,) 6 Mass. 435, 438; *Codman* v. *Winslow*, (Cumberland, 1813,) 10 Mass. 146; *Lapish* v. *Bangor Bank*, 8 Maine, 85, 93; *Emerson* v. *Taylor*, 9 Maine, 43; *Knox* v. *Pickering*, 7 Maine, 106, 109; *Parker* v. *Cutler Milldam Co.* 20 Maine, 353; *Deering* v. *Long Wharf*, 25 Maine, 51, 64; *Winslow* v. *Patten*, 34 Maine, 25; *Partridge* v. *Luce*, 36 Maine, 19; *Moulton* v. *Libbey*, 37 Maine, 472, (where the effect of the ordinance upon rights to fisheries is considered,) *Clancey* v. *Houdlette*, 39 Maine, 451, 456; *Hill* v. *Lord*, 48 Maine, 83.

It must be regarded as settled that the public have such rights to fish in the waters of Grindstone Pond, and such way of approach to it for that end as the ordinance gives them unless the right has been abridged by subsequent legislation. It may be true that our ideas of "great ponds" are not precisely similar to those which our ancestors brought from England—that there no longer exists the same necessity for free fishing and fowling to enable men to get the means of sustenance, which existed in 1641— that the right is now chiefly exercised by pleasure seekers and idle tramps who might be more profitably employed, and who cause more loss and destruction in timber and wood-lands than their pursuits yield advantage in the way of pleasure or profit— that their outgoings and incomings are attended by constant trespasses upon the farms which lie in their way, and in short that it would be for the general good to restrict the privileges they have heretofore enjoyed. But these are considerations to be addressed to the legislature rather than to the court, whose power is to be exercised in ascertaining and declaring the law, and in applying the old principles unchanged to the ever varying circumstances

of new cases presented and sometimes to the newly developed industries of the age (as the Massachusetts court applied this ordinance, in *West Roxbury* v. *Stoddard*, 7 Allen, 158,) but not in setting aside its plain doctrines because they are not in accord with our own views of what it should be, when the legislature, which is properly charged with the duty of promoting the public good and preventing mischief so far as law making will do it, has not seen fit to intervene.

Has there been any legislation which affects the rights of these parties? In the R. S., c. 40, § § 51-53 inclusive, as amended by c. 170, laws of 1874, we find provisions which would give to those who establish within their own premises the means and appliances for the cultivation of useful fishes an exclusive right to fish the waters thus used; and this wherever it is applicable would limit the common right so long as the proprietor of the pond took the steps necessary within the purview of the statute for the artificial breeding and cultivation or maintenance of such fishes.

But neither the allegations nor the proof bring this case within these provisions.   All the plaintiff seems to have done " to protect and forward the propagation of fish," (and even this is not alleged in the writ, but only that the defendant hindered and delayed their propagation,) was to post his prohibitory notices to prevent, so far as he could thereby, indiscriminate poaching upon what he proposed to make a private preserve.   But he does not seem to have done anything for the regular and systematic cultivation or maintenance of the fish, and without this the prohibition was without avail.   He could not thus abridge the common right without doing anything which the statute impliedly requires to give him peculiar privileges.

The legislature has power over the whole subject so far as public and common rights are concerned, and may by statute impose penalties upon the taking of fish by any one except under certain restrictions, even in the waters contiguous to his own land.   *Nickerson* v. *Brackett*, Hancock county, 10 Mass. 212; *Burnham* v. *Webster*, Cumberland Co. 5 Mass. 266, 269; and it cannot be doubted that they may also abridge the common right in favor of the proprietor when they are satisfied that the

interests of the public will be best served by an ampler recognition of the right of private property.

The legislature of Massachusetts have already changed the definition of a "great pond" as given in the colonial ordinance so that those only which contain more than twenty acres, instead of those exceeding ten, are subject to the public right of fishing conferred thereby. Mass. St. of 1869 c. 384, § 7; *Com.* v. *Tiffany*, 119 Mass. 300. But in the absence of any such enactment limiting the public right in this state, we must continue to regard natural ponds exceeding ten acres in extent, and which have not been devoted by the proprietors to the artificial cultivation or maintenance of useful fishes, as "great ponds," the fish in which may lawfully be taken by any one who can and does obtain access to the pond in the manner recognized as lawful in the colonial ordinance. In the outset the right seems to have been conferred only upon householders of the town where it was to be exercised, and under the proviso that "no man shall come upon another's propriety without their leave" which would, of course restrict the right, not only with respect to the persons who might lawfully exercise it, but to such ponds as could be reached without committing a technical trespass by going upon another man's land without license; but, by the further definition, the right of free fishing and fowling on "great ponds lying in common" was extended to all, with the right to "pass and repass on foot through any man's property for that end, so they trespass not upon any man's corn or meadow," and this we think gave the fisherman the right to approach the pond through unenclosed woodlands to whomsoever belonging, but not to cross another man's tillage or mowing land.

One common law limitation of these fishing rights, excluding the public from unnavigable streams where they flow through another's land, was well recognized in *Waters* v. *Lilley*, 4 Pick. 145; and various *dicta* in different cases cited indicate that the courts have no disposition to extend the privilege so as to justify or excuse any unwarranted interference with the rights of the owners of land lying on the margin of such waters.

The case shows that some two acres upon the shore and adjacent to the pond had been cleared and cultivated. From this it

may be fairly inferred that it was in a condition to produce grass, and the fact that none was actually cut there in 1880, does not rebut the inference. *Non constat* but the intrusions of defendant and others upon like errands, may have made it worthless. The location and fact of previous cultivation, in the absence of proof that it had reverted to a state of nature, fairly indicate that it ought to be classed with the land denominated in the colonial ordinance "meadow," and it was, by the very terms of the ordinance on which he relies, incumbent upon the defendant to see to it that he did not trespass on it. It appears on the contrary that he passed over and through this cleared and cultivated piece of land. There is nothing in the case which suggests the acquirement of any right so to do by prescription, and the idea of license is expressly negatived.

*Judgment for plaintiff for $1.00 damages.*

APPLETON, C. J., VIRGIN, PETERS, LIBBEY and SYMONDS, JJ., concurred.